## De Hollander v. De Hollander.

*Divorce—Vacation of decree of divorce—False testimony as to residence and desertion.*

A decree of divorce will be vacated where the libellant's statement that he had had one year's actual *bona fide* residence in Pennsylvania previous to the filing of the libel and his testimony as to the respondent's desertion are shown to have been wholly false.

Petition to revoke decree of divorce. C. P. Wayne Co., Oct. T., 1918, No. 33.

A. G. Rutherford, for rule; Mumford & Mumford, contra.

SEARLE, P. J., May 8, 1922.—Nov. 8, 1918, libel in divorce was presented in this case, setting forth as a cause for divorce desertion under the statute, and also commission of adultery with one Eugene Jewett and others.

Subpœna was awarded, returned Dec. 9, 1918, by the Sheriff of Wayne County, setting forth "respondent within named is not found within my bailiwick." An *alias* was issued, with a like return made Jan. 20, 1919.

Order of publication was granted, returned by the sheriff Feb. 15, 1919, that publication had been duly made.

March 13, 1919, a master was appointed. No appearance was entered in the case for the respondent, nor did she appear, either in person or by attorney, before the master.

April 10, 1919, evidence was taken before the master, the libellant being present with his attorney and two witnesses.

April 14, 1919, the master filed his report, in which, among other things, he states: "The libel contains a charge of adultery. No competent evidence was presented to the master to sustain this charge, such evidence of adulterous practices as were received by him being received for the purpose of substantiating the fact of desertion." The master, however, found that the respondent had wilfully and maliciously deserted the libellant, and recommended a divorce.

Upon considering the report of the master and the testimony offered before him, this court, on said April 14, 1919, entered an absolute decree of divorce.

April 12, 1920, the respondent presented her petition, setting forth, among other matters, the following:

"2. That the said Myron De Hollander was employed by the Rochester Railway Company and the New York State Railways from March, 1886, until January, 1918.

"5. That although the said Myron De Hollander knew of the whereabouts of your petitioner, he did in no way give notice of said proceedings to your petitioner.

"6. That your petitioner has read the transcript of evidence taken at said hearing, and the evidence therein set forth is almost wholly false.

De Hollander *v.* De Hollander.

"7. Your petitioner avers that the said Myron De Hollander was never a citizen of the State of Pennsylvania and was never a resident there for the period of one year prior to the filing of said libel in divorce; that he is a resident of the State of New York, and has almost continually for the last twenty years been a resident of said State of New York and lived in the City of Rochester.

"8. That your petitioner did not desert the said Myron De Hollander on Jan. 12, 1916, nor did she leave his habitation, but, on the contrary, she was living with the said Myron De Hollander as his wife on Parke Avenue, Rochester, N. Y., on that date, and continued so to live with him as his wife until he left her in the middle of January, 1918.

"9. That during the year 1918 your petitioner is informed that the said Myron De Hollander remained in and about Rochester, N. Y., and he continued to pay her $4 a week as directed by the Police Court of the City of Rochester, N. Y., and said payments continued until April 18th, when your petitioner received a letter from an attorney in New York State, enclosing a decree in divorce granted in this case."

Upon presentation of said petition to the court on said April 12, 1920, rule was granted "to show cause why the decree in divorce granted in this case, separating him (Myron De Hollander) from the said Nancy De Hollander, should not be vacated and declared null and void and all proceedings in the case set aside, returnable to the second Monday of May, 1920."

Upon return of said rule, the respondent, on May 10, 1920, filed his answer thereto, setting forth, among other things: "Libellant admits the second . . . sections of said petition," but again alleges he was a resident of Pennsylvania for over a year prior to the filing of his libel for divorce. He also denies that he was "directed by the Police Court of Rochester, New York, to pay petitioner the sum of $4 per week, or any other sum."

On May 28, 1920, the respondent presented a petition to take testimony before one Walter A. Swan, a notary public in and for the County of Monroe, State of New York, with offices at 845 Powers Building, Rochester, New York, and on the same day the court made the following order:

"Now, to wit, May 28, 1920, upon presentation of the within petition and upon consideration of the facts therein contained, Walter A. Swan, notary public, of Rochester, New York, is appointed examiner to take the testimony of Nancy K. De Hollander, Ivy M. King and any other witnesses that the said Nancy K. De Hollander may deem necessary for her cause, upon at least ten days' notice of the time and place of taking such testimony being given to the said Myron De Hollander or his attorney. At which time the said Myron De Hollander and counsel may be present and cross-examine such witnesses if they so desire. The said Walter A. Swan, examiner, shall have such testimony taken in shorthand and transcribed and returned to this court under his hand and seal. Costs of taking such testimony shall be paid by the petitioner and may be taxed as part of the costs of this case."

In pursuance of this order, testimony was taken before Walter A. Swan, examiner, and at all of the various times of taking such testimony the libellant was present, either in person or by attorney, the witnesses were cross-examined, and the testimony so taken, with certain exhibits, was filed in this court on March 10, 1921.

The final determination of the rule heretofore granted has been delayed by the frequent requests of libellant's foreign counsel for continuances. The rule was to be diposed of at January Term of court. We then made an order, however, that if any testimony were to be taken on the part of the libellant, it

2 D. & C.

De Hollander *v.* De Hollander.

must be taken before March Term of court, as the matter would be disposed of at that time. No testimony was taken on the part of the libellant, and the rule to show cause was argued by counsel for respondent, libellant's attorney of record being present.

In considering the rule, we will first consider the competency of the testimony taken.

Objection was made by libellant's counsel, both before and after the taking of the testimony, on the ground that insufficient notice was given, as provided by the Act of Assembly of June 25, 1895, P. L. 279. Now, while this act provides for twenty days' notice to be given, we would hesitate in this case to sustain the objection to the taking of the testimony, because the time of taking was adjourned at libellant's request, and he was present, either in person or by counsel, and generally in person and with counsel, and the witnesses were cross-examined by his counsel.

This testimony, however, was taken as provided by the Act of June 8, 1911, P. L. 709, which directs that the court "may prescribe the notice to be given and the time within which such testimony shall be taken."

Testimony was taken with great care and with due regard to the rights of the parties. The objection made by libellant's counsel to the testimony has no merit, and is dismissed.

In considering the rule, two questions arise: 1. Was the libellant a resident of Pennsylvania for one full year before filing his libel? This question alone, decided in the negative, would require us to make the rule absolute. 2. Did the respondent desert libellant?

The libel in this case was filed Nov. 8, 1918. In the libel oath is made that libellant resided in Wayne County one full year previous to its filing. Libellant must, therefore, have resided in Wayne County, Pa., at least from Nov. 8, 1917, to Nov. 8, 1918.

The testimony before the master was taken April 10, 1919. Testifying before the master, libellant was asked: "Q. How long have you resided in Wayne County, Pa.? A. Since 1917, Oct. 1st, up to the present time" (the present time being April 10, 1919).

From the depositions filed, we find that the petitioner testified that her husband resided with her until Jan. 8, 1918, and she gives in great detail where they were residing until that time.

A certified copy of the proceedings in the Supreme Court, County of Monroe, State of New York, against Myron De Hollander, charging that on Jan. 8, 1918, he abandoned his son, George De Hollander, was offered in evidence, and shows that Myron De Hollander, on March 28, 1918, entered a recognizance before the Honorable Willis K. Gillett, Monroe County judge, and that Myron De Hollander was there in court at that time; and Nancy De Hollander testified that she had seen him a number of times on the streets of Rochester, where he was arrested between Jan. 8th and March 13, 1918, the date of giving the recognizance. Letters were also offered, in the handwriting of Myron De Hollander, mailed from Rochester, New York.

Sarah Brasser, a sister of Myron De Hollander, quite reluctantly testified that she saw him in the City of Rochester in 1917 or 1918; that she saw him in the spring of 1918 on the street car.

Cornelius E. Brasser, brother-in-law of Myron De Hollander, testified that he was at the funeral of Ruth, a daughter of Myron De Hollander and Nancy De Hollander, who died in 1917; that he had frequently seen him, and that he was employed by the railroad company in the City of Rochester until the year 1918, and he did not know of his being out of the city.

De Hollander v. De Hollander.

Ivy M. King testified that Myron De Hollander left his wife, Nancy De Hollander, Jan. 8, 1918; that he was living with her until that time; that he said he was going to Detroit to look for work. She fixes the time positively by reason of the fact that she kept a book for the payment of the board, and that Mr. and Mrs. De Hollander came to board with her on Sept. 15, 1917, and she testifies positively that they were there from Sept. 15, 1917, to Jan. 8, 1918. The book was offered and received in evidence.

Harry G. King, husband of Ivy M. King, testified he had known libellant for twenty-four years; that libellant and petitioner boarded with them until the first week in January, 1918; that he left on Jan. 8, 1918. He also testified to seeing libellant in the summer of 1918, and he appeared to be directing the street car service. He also saw him another time in 1918, working for the street car company.

Eugenia F. Jewett testified she had known Mr. De Hollander for about thirty-five years; that De Hollander was in the City of Rochester, living with his wife, until Jan. 8, 1918, or about that time. She was sure it was the year 1918. That Mr. and Mrs. De Hollander were living together.

Myrtle May Brower, a daughter of Myron and Nancy De Hollander, testified that her mother came to her in January, 1918, and that previous to that time her father and mother were living together with her aunt, Mrs. King. She testified quite particularly where they lived before that time; that she saw her father when he was in the court when he was arrested. She identified certain letters which were offered in evidence, which she said were in her father's handwriting and written by her father to her mother, and in which money was sent by her father to her mother, and postmarked Rochester.

Benjamin Pew testified that he lived in Rochester and conducted a rooming-house; that Mr. De Hollander came to his house in August or September, 1918; that he stayed there nearly a year; that he went away the next July. He was positive he came there prior to Oct. 1, 1918. He said De Hollander was working in a munitions plant; that he went away in 1919. He testified that the city directory was made in the spring of 1919 and Myron De Hollander's name appears in the said directory.

Florence Pew, wife of Benjamin Pew, also testified to the libellant's coming to their place in August, 1918; that he stayed there until July, 1919. She testified they took the directory in the spring of 1919, and he went away then. Her testimony is very conclusive.

W. L. Manning testified that in the year 1918 he saw De Hollander in the City of Rochester and that he knew him; that De Hollander worked for the street car company; "he appeared to be instructing the motorman."

Andrew Berg testified that he was deputy sheriff and had known Myron De Hollander for ten or twelve years, and during that time was an inspector on a street car; that he arrested him on a warrant issued on complaint of his wife, at Block Rock, just outside of Buffalo, New York, on March 2, 1918; that he brought him to Rochester on March 3, 1918; that, after the arrest, he went back to his job; that when he was arrested he said he was afraid he would not get back to his job. "He talked about getting his job back when we were coming down on the train from Black Rock;" that when he was arrested he was a night watchman at some factory, the Curtis Areoplane Company.

Besides this, letters were offered in evidence and the proceedings before the Police Court in Rochester, showing the arrest of De Hollander, and that he appeared and gave bail to answer, and that he was indicted for desertion of his child under sixteen years of age.

2 D. & C.

### De Hollander v. De Hollander.

From all this testimony there can be no question—not even a reasonable doubt—that Myron De Hollander, the libellant, did not have any such residence·in the State of Pennsylvania as would permit him to apply or ask for a divorce, but, on the contrary, he was residing in the State of New York.

It is significant that in the testimony taken before the master, the libellant simply said he had resided in Pennsylvania between certain dates. Nothing was shown as to what constituted this residence, but he testified to a conclusion only. The testimony, therefore, is irresistible that the court of Wayne County had no jurisdiction in this case, and for this cause alone the decree should be vacated.

The question of desertion needs little discussion. However, that both questions may be disposed of, we have examined all the testimony carefully and find that the allegations of De Hollander that his wife deserted him are absolutely refuted. According to his testimony, his wife deserted him on Jan. 12, 1916, and never came back. The positive testimony of the witnesses shows that Myron De Hollander and Nancy De Hollander were living together until at least Jan. 8, 1918. A number of witnesses testified that the daughter, Ruth, died Jan. 13, 1917, and that De Hollander and his wife were then living together. Witnesses also testified that when De Hollander left on Jan. 8, 1918, he said he was going to Detroit to look for work; and his wife testified he would send her money as soon as he got work.

In fact, instead of the wife deserting the husband, it is clear, from the testimony, that the husband deserted the wife, and that he was brought to Buffalo upon a bench warrant, and that, in pursuance of this proceeding, he paid his wife a certain sum of money, and that the first intimation his wife had that any divorce had been granted was a letter from De Hollander's attorney, Charles E. Bostwick, Esq., of Rochester, N. Y., a copy of which is as follows:

"CHARLES E. BOSTWICK,
"Attorney and Counsellor at Law,
"Rochester, N. Y., April 17th, 1919.
"Mrs. Nancy K. De Hollander,
"329 Jefferson Ave., City.
"Dear Madam: I am enclosing you a copy of divorce granted your husband, Myron De Hollander, in the State of Pennsylvania, which became operative on the 15th day of April, 1919.
"Your husband desires me to notify you that after this week he will pay no further alimony to you.                                   Very truly yours,
"904-906 Insurance Building.                               C. E. BOSTWICK."

This whole case, so far as the residence and desertion are concerned, appears to be made up of false and fraudulent testimony on the part of the libellant.

The master in the case evidently was imposed upon in recommending a decree, as the court was in granting it.

One course is clear. Not only have we the legal right to make the·rule absolute, but this is our plain duty. The proceedings are regular in every respect. The proper proceeding to set aside a decree of divorce obtained by fraud is by petition and rule: Wilt v. Wilt, 2 Dauphin Co. Reps. 100.

The court will vacate a decree where the libellant's statement that he has had one year's actual, *bona fide* residence in Pennsylvania previous to the filing of the libel is shown to have been false: Fitch v. Fitch, 1 C. P. Repr. 46; Nickerson v. Nickerson, 16 Phila. 154; King v. King, 28 Pa. C. C. Reps. 313; Allen v. Maclellan, 12 Pa. 328; Wanamaker v. Wanamaker, 2 Pearson, 166; Rottger v. Rottger, 50 Pa. C. C. Reps. 13. We think this case needs no further discussion.

De Hollander *v.* De Hollander.

And now, May 8, 1922, the application in this case came on to be heard upon the petition, answer and evidence, and was fully argued by counsel, whereupon it is considered by the court that the decree made on April 14, 1919, granting a divorce to Myron De Hollander from the bonds of matrimony contracted between him and his wife, Nancy K. De Hollander, be and the same is hereby rescinded, revoked and annulled as fully as if the same had never been made and ordered, and it is further decreed that the said Myron De Hollander pay the cost of this proceeding.

From A. G. Rutherford, Honesdale, Pa.